1 | DAVID GROSSMAN (SBN 211326)
dgrossman@loeb.com
2 | ERIN SHIELDS (SBN 337121)
eshields@loeb.com
3 | LOEB & LOEB LLP
10100 Santa Monica Blvd., Suite 2200
4 | Los Angeles, CA  90067
Telephone: 310.282.2000
5 | Facsimile: 310.282.2200

6 | Attorneys for Defendant
PARAMOUNT PICTURES CORPORATION
7 |

8 | UNITED STATES DISTRICT COURT

9 | CENTRAL DISTRICT OF CALIFORNIA

10 |

11 | BAYARDO RENO SANDY,  |  Case No.: 2:24-cv-04403-RGK-RAOx

12 | Plaintiff,

13 | v.  |  **DEFENDANT'S MOTION TO DISMISS**

14 | PARAMOUNT PICTURES  |  [Filed concurrently: *Declaration of David Grossman; Request for Judicial Notice; Notice of Lodging; [Proposed] Order*]
CORPORATION,
15 |

16 | Defendant.  |  Date:  November 18, 2024
Time: 9:00 a.m.
17 |  Courtroom: 850

18 |

19 |

20 |  Complaint Filed: May 28, 2024

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

239555273
202830-10079

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that, on November 18, 2024, at 9:00 a.m., in Courtroom 850 of the above-captioned court, located at 255 East Temple Street, Los Angeles, CA 90012, Judge R. Gary Klausner presiding, Defendant Paramount Pictures Corporation ("Defendant") will, and hereby does move to dismiss Plaintiff Bayardo Sandy's ("Plaintiff") Complaint in its entirety.  This motion is made on the grounds that Plaintiff has failed to adequately allege a plausible theory of access, and direct examination of Plaintiff's and Defendant's works shows that they are not substantially similar as a matter of law.  Accordingly, Plaintiff's claim for copyright infringement, as well as well as his claims for declaratory and injunctive relief, which depend on a finding that Defendant infringed Plaintiff's work, must be dismissed.

The Motion to Dismiss is based upon this Motion, the supporting Memorandum of Points and Authorities, the concurrently filed Request for Judicial Notice, all records and pleadings on file with the Court in this action and on such further evidence and argument as may be presented at or before the time of hearing.

This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on October 7-8, 2024.  (*See* Declaration of David Grossman ("Grossman Decl.") ¶5, Ex. D).

Dated:  October 15, 2024

LOEB & LOEB LLP
DAVID GROSSMAN
ERIN SHIELDS


By:    */s/ David Grossman*
David Grossman
*Attorneys for Defendant*
PARAMOUNT PICTURES
CORPORATION

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

239555273
202830-10079

1

DEFENDANT'S MOTION TO DISMISS

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ........................................................................................ 1

II.    STATEMENT OF FACTS ......................................................................... 2

    A.    Defendants' Infinite, Based on The Reincarnationist Papers ............. 2

    B.    Plaintiff's The Link. ........................................................................... 5

III.   ARGUMENT .............................................................................................. 7

    A.    Plaintiff Fails to Plausibly Allege Defendants' Access to The Link. ................................................................................................... 7

    B.    The Works Are Not Substantially Similar. ....................................... 10

        1.    To State a Claim, Plaintiff Must Demonstrate "Substantial Similarity" Between the Works' Protected Elements. ................................................................................. 10

        2.    The Court Can Compare the Works and Determine Lack of Substantial Similarity on a Motion to Dismiss. .......... 11

        3.    The Protectable Elements of the Works Are Not Similar. ............................................................................... 12

IV.    CONCLUSION ......................................................................................... 20

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

239555273
202830-10079

ii

DEFENDANT'S MOTION TO DISMISS

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Art Attacks Ink, LLC v. MGA Enter. Inc.*,
 581 F.3d 1138 (9th Cir. 2009) ............................................................................7

*Benay v. Warner Bros. Entm't, Inc.*,
 607 F.3d 620 (9th Cir. 2010) ..............................................................13, 14, 16

*Berkic v. Crichton*,
 761 F.2d 1289 (9th Cir. 1985) .....................................................................11, 13

*Bernal v. Paradigm Talent & Literary Agency*,
 788 F. Supp.2d 1043 (C.D. Cal. 2010) ...............................................................9

*Carlini v. Paramount Pictures Corp.*,
 No. 21-55213, 2022 U.S. App. LEXIS 5480 (9th Cir. Mar. 2, 2022)...............12

*Cavalier v. Random House, Inc.*,
 297 F.3d 815 (9th Cir. 2002) ............................................................................11

*Christenson v. FLTI*,
 No. 6:13-cv-00254-AA, 2013 U.S. Dist. LEXIS 154029 (D. Or. Oct.
 23, 2013) ...........................................................................................................13

*Clanton v. UMG Recordings, Inc.*,
 556 F. Supp. 3d 322 (S.D.N.Y. 2021) .................................................................8

*Cline v. Reetz-Laiolo*,
 329 F. Supp. 3d 1000 (N.D. Cal. 2018)............................................................20

*DC Comics v. Towle*,
 802 F.3d 1012 (9th Cir. 2015) ..........................................................................16

*DuMond v. Reilly*,
 No. CV 19-8922-GW-AGRx, 2021 U.S. Dist. LEXIS 37241 (C.D.
 Cal. Jan. 14, 2021)............................................................................................20

*Fillmore v. Blumhouse Prods., LLC*,
 No. 2:16-cv-04348-AB-SS, 2017 U.S. Dist. LEXIS 211021 (C.D.
 Cal. July 7, 2017)........................................................................................13, 19

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

239555273
202830-10079

iii

DEFENDANT'S MOTION TO DISMISS

*Funky Films v. Time Warner Entm't Co., L.P.*,
    462 F.3d 1072 (9th Cir. 2006) ................................................................... 11, 13

*Gable v. NBC*,
    727 F. Supp.2d 815 (C.D. Cal. 2010) ........................................................ 13, 15

*Gray v. Perry*,
    No. 2:15-cv-05642-CAS, 2018 U.S. Dist. LEXIS 138263 (C.D. Cal.
    Aug. 13, 2018) .................................................................................................. 9

*Griffin v. Peele*,
    No. EDCV 17-01153 JGB (KKx), 2018 U.S. Dist. LEXIS 226086,
    at *16 (C.D. Cal. Jan. 18, 2018) ........................................................... 8, 10

*Jason v. Fonda*,
    526 F. Supp. 774 (C.D. Cal. 1981) ............................................................... 8

*Kouf v. Walt Disney Pictures & Television*,
    16 F.3d 1042 (9th Cir. 1994) ...................................................................... 11, 15

*Litchfield v. Spielberg*,
    736 F.2d 1352 (9th Cir. 1984) ........................................................................ 15

*Lois v. Levin*,
    No. 2:22-cv-00926-SVW-ADS, 2022 U.S. Dist. LEXIS 168358
    (C.D. Cal. Sept. 16, 2022) ............................................................................... 8

*Loomis v. Cornish*,
    836 F.3d 991 (9th Cir. 2016) .............................................................. 8, 9, 10

*Masterson v. Walt Disney Co.*,
    821 F. App'x 779 (9th Cir. 2020) ................................................................. 12

*Olson v. NBC*,
    855 F.2d 1446 (9th Cir. 1988) ....................................................................... 20

*Panton v. Strong*,
    2018 WL 5099666 (C.D. Cal. Mar. 14, 2018) ............................................ 10

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
    602 F.3d 57 (2d Cir. 2010) ............................................................................ 12

*Rentmeester v. Nike, Inc.*,
    883 F.3d 1111 (9th Cir. 2018) ..................................................... 7, 11, 12

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

239555273
202830-10079

DEFENDANT'S MOTION TO DISMISS

*Rice v. Fox Broad. Co.*,
    330 F.3d 1170 (9th Cir. 2003) ................................................................. 8

*Rose v. Connelly*,
    38 F. Supp. 54 (S.D.N.Y. 1941) ............................................................ 17

*Shame on You Prods. v. Banks*,
    120 F. Supp. 3d 1123 (C.D. Cal. 2015), *aff'd* 690 F. App'x 519
    (2017) ........................................................................................... 16, 20

*Silas v. HBO, Inc.*,
    201 F. Supp.3d 1158 (C.D. Cal. 2016) .............................................. 12, 16

*Three Boys Music Corp. v. Bolton*,
    212 F.3d 477 (9th Cir. 2000) ................................................................. 7

*Washington v. ViacomCBS, Inc.*,
    No. CV 20-435 CBM (PJWx), 2021 U.S. Dist. LEXIS 104820, at *5
    (C.D. Cal. May 21, 2021) .................................................................... 10

*Whitehead v. Netflix, Inc.*,
    No. 22-cv-04049-CRB, 2022 U.S. Dist. LEXIS 215901 (N.D. Cal.
    Nov. 30, 2022) ............................................................................... 8, 12

*Zella v. E.W. Scripps Co.*,
    529 F. Supp.2d 1124 (C.D. Cal. 2007) ................................................. 12

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

239555273
202830-10079

DEFENDANT'S MOTION TO DISMISS

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Defendant's 2021 film, *Infinite*, is about a protagonist who is an "Infinite," one of 500 people on earth who can remember their past lives, and retain the skills they developed during those lives.  He and his fellow "Believers" (Infinites who are dedicated to using their skills and knowledge to protect humanity) battle against evil Nihilists – Infinites who see their power as curse, and seek to eradicate all life on earth in order to end the cycle of reincarnation.  *Infinite* is based on and credits *The Reincarnationist Papers*, a 2009 novel that is also about a group of reincarnationists that remember their past lives.

Plaintiff Bayardo Sandy ("Plaintiff") alleges that *Infinite* is not based on *The Reincarnationist Papers*, but rather infringes his own novel, *The Link*, which also involves the unprotectible concept of reincarnated characters.  However, Plaintiff does not set forth a single fact plausibly establishing that anyone involved in creating *Infinite* ever heard of his novel, much less copied it.  For this reason alone, Plaintiff's complaint must be dismissed.

Moreover, when the Court actually reviews the works themselves, it will see that the works are completely dissimilar, and that there is no legally cognizable "substantial similarity" between the two.  *Infinite's* protagonist, Evan, is diagnosed with schizophrenia and has trouble holding down a job, but later learns that his diagnosis can be explained by the fact that he is one of approximately 500 Infinites – people who remember their past lives, and are split into warring factions of Nihilists and Believers.  Evan must remember his previous life in order to locate the "Egg," a device created by the Nihilists to achieve their goal of ending all life on Earth.  In a series of action sequences, the two groups battle each other in Mexico City, New York, in a mountain retreat in Asia, and at a large estate in Scotland.  Eventually, Evan and his friends secure the Egg and defeat the Nihilists, with Evan and his friends dying in the process, only to be later reborn.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

239555273
202830-10079

1

DEFENDANT'S MOTION TO DISMISS

*The Link*, by contrast, is about Sydney Tobias, a famous astrologer and novelist who begins to remember his past lives: meeting the three wise men after Jesus Christ's birth, visiting the library of Alexandria, and consulting with Nostradamus in 1500s France.  Sydney's adversary throughout these lifetimes is the Biblical figure of Judas Iscariot, who, in his own reincarnations, has fomented genocide against the Jewish people.  Sydney is on a quest to locate the reincarnated version of Jesus Christ and, utilizing his astrological predictions, he eventually finds Jesus in the form of a boy named Charlie living in Alabama.  The story ends on September 11, 2001, when Jesus/Charlie attends a multi-denominational religious service and frees the souls of soldiers killed in 1990s military conflicts (Iraq and Bosnia).  The Jesus/Charlie character also persuades Judas (now in the form of a female librarian) that he was misguided in his quest to eradicate the Jews.

Any "similarity" between these vastly different works derives from the highly abstracted, non-protectible concept of a man who remembers his past lives, and uses that ability to try to help good triumph over evil.  Copyright law is clear that alleged similarities in basic plot ideas or general concepts cannot give rise to an infringement claim, and a review of the works demonstrates that their respective treatments of these underlying concepts are **<u>entirely dissimilar</u>**.

Courts in this District have not hesitated to dismiss copyright claims at the pleading stage in these circumstances.  Because no amount of discovery can change the content of the works, Plaintiff's Complaint should be dismissed with prejudice.

## II.    STATEMENT OF FACTS

### A.    Defendants' *Infinite*, Based on *The Reincarnationist Papers*

*Infinite:*  Defendants' film opens with a voiceover, explaining that there are people known as Infinites who remember their past lives.  Notice of Lodging Ex. A at 0:53-1:35.  As described above, there are two competing groups of Infinites: Believers and Nihilists.

In 1985 Mexico City, a Believer named Heinrich Treadway is involved in a

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

239555273
202830-10079

2

DEFENDANT'S MOTION TO DISMISS

car chase with Nihilists, including a man named Bathurst, who are after him because he has acquired their superweapon, "the Egg." 1:35-7:44. He is aided by fellow Believers Abel and Leona, and tells the other two to "look inside" if he does not survive. Treadway drives off a bridge, using his abilities to jump from his car in mid-air and escape onto a crane 150 feet away. Bathurst's truck then plows into Abel and Leona's car. He approaches them and fires a bullet from a "Dethroner," a special gun that (it is later revealed) has the power to steal an Infinite's consciousness and thus prevent them from reincarnating.

In present-day New York City, Evan McCauley applies for a job at a restaurant, but because of his history of institutionalization[1] and violent behavior, he is rejected. 7:45-11:15. In order to pay his rent, and buy his medication, Evan forges a katana for a drug dealer, even though he does not recall ever having been trained as a blacksmith. 11:15-13:21. After the deal goes south, Evan is pursued by the police and is later arrested. 13:21-18:22. Following Evan's arrest, other Infinites deduce that he is the reincarnated Treadway. 18:22-19:07. A man at the police station introduces himself to Evan as Bathurst, claiming they have known each other for centuries. 19:08-24:55. Bathurst attempts to trigger Evan's memories of his prior incarnations by showing his possessions from those past lives.

Eventually, Evan experiences a flash of a memory from a past life, but just then, another Infinite, Nora (the reincarnated Leona) drives through the jail wall and helps Evan escape. 24:40-32:18. Nora explains that Evan is not a schizophrenic, but is an Infinite, and tells him of the conflict between Nihilists like Bathurst, who want the world to end, and Believers, who want to use their powers to help mankind.

Nora takes Evan to the "Hub," the Believers' headquarters embedded in a remote mountain, where the Believers conduct research and train to fight the Nihilists. 33:48-37:20. Evan meets other Believers and learns that Bathurst,

---

[1] It is later revealed that Evan was institutionalized as a teen, when most Infinites begin remembering their past lives, for carving the words "look inside" on his chest.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

239555273
202830-10079

3

DEFENDANT'S MOTION TO DISMISS

desperate to stop endlessly reincarnating, had commissioned the creation of the Egg, which has the power to kill every living thing on earth, thus stopping the cycle of reincarnation. 38:26-41:20. As Treadway, Evan had stolen the Egg, and Bathurst is trying to capture Evan to find out where he hid it. 41:20-41:50.

Bathurst and his colleague locate Porter, another Believer, and torture him for Evan's whereabouts, before Bathurst shoots Porter with the Dethroner (which operates by keeping its victims' souls captive in a digital file). At the Hub, Evan learns that his predecessor, Treadway, was able to manipulate the energy of the world around him. 41:50-46:42. Evan struggles to regain Treadway's memories. 52:52-54:22. Evan and other Infinites visit the hideout of a hedonistic Infinite, The Artisan. 58:07-1:09:12. The Artisan restores Evan's memories by using a machine that drowns Evan, temporarily stopping his heart. The machine "reboots" his mind and Evan remembers that, before he died, Treadway hid the Egg inside his stomach.

Bathurst, who has infiltrated the Hub, overhears this, locates Treadway's body (which the Believers had kept preserved), and finds the Egg hidden inside. 1:09:01-1:15:05. Evan, Nora and The Artisan fight their way into Bathurst's castle, but Bathurst escapes on a plane with the Egg. 1:16:40-1:25:32. Evan is able to jump a motorcycle onto the plane and, regaining Treadway's ability to manipulate energy, is able to walk across the plane's surface as it flies. Evan enters the plane, fights with Bathurst, but the armed Egg falls out of the plane. Evan jumps out after it and attempts to deactivate the Egg in midair; Bathurst jumps out after him and they battle as they plummet. Evan is able to disarm the Egg and "Dethrones" Bathurst before Evan crashes into the ocean and dies. 1:26:10-1:33:19.

Nora and The Artisan are able to free the souls of all the trapped Believers stored in Bathurst's castle, but Nora dies in the process. 1:33:20-1:34:26. Years later, Evan is reborn in Indonesia. The Artisan, now older, visits and offers Evan's katana to the "new" Evan, who then regains his memories. 1:35:50-1:37:44.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

239555273
202830-10079

4

DEFENDANT'S MOTION TO DISMISS

***The Reincarnationist Papers***:  *Infinite* is based on the novel *The Reincarnationist Papers* ("*TRP*") by D. Eric Maikranz.  *See id* at 1:37:56; *see also* Compl. ¶69.  The protagonist of *TRP* is Evan Michaels, a professional arsonist.  *See* Notice of Lodging Ex. B.  As in *Infinite,* Evan is pursued by the police in the opening scene.  He is shot in the foot and takes refuge in what he thinks is a church.  A woman named Poppy briefly holds Evan at gunpoint because she suspects he is a fugitive.  Evan tells Poppy that he remembers a prior life in which he died, as a boy, in a house fire.  Poppy reveals that she is a member of the Cognomina, a group of people that remember their past lives.  According to the Cognomina, although everyone reincarnates, only a few are able to remember their past lives.

Poppy brings Evan to the group's headquarters, where he learns about reincarnation.  Evan endures a multi-day inquisition about his past lives and memories.  This process is called "The Ascension" – if he passes, he will be part of the group.  If not, he will be killed.  Poppy is Evan's "sponsor" for the Ascension.  Evan completes the inquisition and is officially inducted into the Cognomina.

While some of the story points from *TRP* differ from *Infinite*, this underlying work contains the concept of a male protagonist who does not realize he is capable of reincarnation, but who is inducted into a group of Reincarnationists, who teach him about their powers and about their secret society.

**B.    Plaintiff's *The Link*.**

Plaintiff's *The Link* follows a famous astrologer, Sydney Tobias.  *See* Compl. Ex. 10.  The story begins as Sydney is conducting a "reading" for a billionaire client, which is interrupted when Sydney is informed that his father, Horace, is in the hospital.  *Id.* at 9-13.  At the hospital, Horace reveals to Sydney that they have known each other in past lives, and that Horace is not actually Sydney's "father."  Horace has been Sydney's protégé, "Luke," in many of their past lives.  *Id.* at 17-21.  Horace says a prayer that allows Sydney to begin recalling these past lives.  *Id.,* 35.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

239555273
202830-10079

5

DEFENDANT'S MOTION TO DISMISS

Sydney remembers his first meeting with Horace/Luke, shortly before the birth of Jesus Christ.  *Id.* at 39.  Horace/Luke and Sydney (then named Elijah) encountered the three wise men from the Bible, and spent time travelling in their company.  *Id.* at 44-47.  One of the wise men, Anaxagoros, taught Luke and Elijah about reincarnation.  *Id.* at 48-58.  Luke and Elijah then spent ten years in the city of Alexandria with Anaxagoros.  *Id.* at 58-60.  They later met an oracle in Delphi, "Mother Gaea," and Elijah developed romantic feelings for her.  *Id.* at 61-64.

Sydney/Elijah and Horace/Luke, throughout each of their incarnations, have been searching for the reincarnated version of Jesus.  *Id.* at 67-70.  There is also an adversary – the Biblical figure of Judas Iscariot – who, for the last 2000 years, has been trying to stop the astrologer (while also seeking to eradicate the Jews).

Back in the present day, in Florida, Sydney's car is blown up and Sydney and Horace are pursued by gunmen.  *Id.* at 71-73.  Horace believes that a man named Nicholas, their "old nemesis," is responsible.  *Id.* at 73.  It is later revealed that "Nicholas" is the reincarnated Judas.  While Sydney attempts to flee, Horace is shot and killed.  *Id.* at 73-77.  Sydney then remembers a past life, around 1093 C.E., when he was imprisoned and tortured by Nicholas at a Vatican prison.  *Id.* at 87-94.  Nicholas, who was an official in the Catholic church, caused Sydney to be burned at the stake along with Lucia, a woman who reveals that she is the same Mother Gaea that Sydney had met in Delphi a thousand years earlier.  *Id.* at 114-117.

In present day Florida, a sniper kills two FBI agents who are supposed to be watching over Sydney at a safehouse.  *Id.* at 119-121.  Sydney, again, manages to escape.  *Id.* at 122-125.  Sydney then travels to San Diego, to the home of a psychic named Lilith.  *Id.* at 133.  Sydney realizes that he is being hunted by an evil librarian, Judy Orman, who is the current incarnation of Judas.  *Id.* at 147-153.  Judy is planning a terrorist attack on New York and Washington.  *Id.* at 174-181.

Ultimately, in 2001, using his astrological predictions, Sydney locates an 11-year old virgin-born boy from Alabama.  *Id.* at 265-293.  At the end of the book, this

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

239555273
202830-10079

6

DEFENDANT'S MOTION TO DISMISS

child-Jesus ("Charlie") attends a Manhattan religious service attended by Christians and Hare Krishna followers. *Id.* at 294-300. Charlie/Jesus gathers the spirits of soldiers from various 1990s military conflicts (Iraq/Bosnia) and saves their souls.

Shortly after the service, planes overhead crash into the twin towers. *Id.* at 305. Charlie/Jesus tells Sydney to keep his identity secret, and to write a fictional book about reincarnation and the virtue of living a good life. *Id.* at 290-91, 307-08. Charlie/Jesus also meets and comforts Judy/Nicholas/Judas. *Id.* at 303-305. In that moment, Judas finally realizes that he had been misguided for thousands of years, and that Jesus did not support Judas' quest to eradicate the Jewish people.

## III.    ARGUMENT

### A.    Plaintiff Fails to Plausibly Allege Defendants' Access to The Link.

To prevail on a claim of copyright infringement, a plaintiff must prove both that (i) the defendant actually copied plaintiff's work, and (ii) that such copying was "unlawful." *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1117 (9th Cir. 2018). With respect to the first prong, where, as here, direct evidence of "actual copying" cannot be shown, a plaintiff "can attempt to prove that fact circumstantially by showing that the defendant had **access** to the plaintiff's work **and** that the two works share similarities probative of copying." *Id.* at 1124 (emphasis added). "[C]ircumstantial evidence can be used to prove access either by (1) establishing a chain of events linking the plaintiff's work and the defendant's access, or (2) showing that the plaintiff's work has been widely disseminated." *Art Attacks Ink, LLC v. MGA Enter. Inc.*, 581 F.3d 1138, 1143 (9th Cir. 2009). However, "[a]ccess may not be inferred through mere speculation or conjecture. There must be a reasonable possibility of viewing the plaintiff's work - not a bare possibility." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482 (9th Cir. 2000).

***Plaintiff Fails To Allege Widespread Dissemination***: In support of his theory of access, Plaintiff alleges that *The Link* is "accessible online as a 5-Star at Amazon.com for 15 years up to *Infinite's* public release in 2021." Compl. ¶14.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

239555273
202830-10079

7

DEFENDANT'S MOTION TO DISMISS

However, Plaintiff has failed to allege any facts suggesting that *The Link* should be considered "widely disseminated."  "In most cases, the evidence of widespread dissemination centers on the degree of a work's commercial success[.]"  *Loomis v. Cornish*, 836 F.3d 991, 997 (9th Cir. 2016).  Courts have held that a work **was not widely disseminated** where as many as 17,000 copies were sold.  *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1178 (9th Cir. 2003); *see also Jason v. Fonda*, 526 F. Supp. 774, 776 (C.D. Cal. 1981) (no access when several hundred copies sold).

Here, Plaintiff does not allege how many copies of *The Link* have been sold; instead, he alleges that the mere availability of the work on Amazon.com is sufficient to show widespread dissemination.[2]  However, the mere availability of the work on the internet is insufficient, by itself, to plausibly allege widespread dissemination.  *Whitehead v. Netflix, Inc.*, No. 22-cv-04049-CRB, 2022 U.S. Dist. LEXIS 215901, at *31-34 (N.D. Cal. Nov. 30, 2022) (fact that plaintiff self-published her book on Amazon was insufficient to show widespread dissemination); *Lois v. Levin*, No. 2:22-cv-00926-SVW-ADS, 2022 U.S. Dist. LEXIS 168358, at *7 (C.D. Cal. Sept. 16, 2022) (collecting cases and holding that availability of work on multiple online platforms was insufficient to show widespread dissemination); *Griffin v. Peele*, No. EDCV 17-01153 JGB (KKx), 2018 U.S. Dist. LEXIS 226086, at *16 (C.D. Cal. Jan. 18, 2018) (mere availability of plaintiff's work on Amazon, where plaintiff had not pled the number of copies of her work sold, was insufficient to show widespread dissemination); *Clanton v. UMG Recordings, Inc.*, 556 F. Supp. 3d 322, 328 (S.D.N.Y. 2021) ("Were [posting a work on the internet considered sufficient], any work that any person uploaded publicly to the internet would have to be considered sufficiently 'widely disseminated' to give rise to an inference that every person had heard it—an inference that would be plainly unreasonable.")

---

[2] Plaintiff notes that *The Link* has been "accessible online as a 5-Star at Amazon.com for 15 years."  Compl. ¶14.  To the extent that Plaintiff alleges the "5-Star" rating of the book is in any way probative of access, it is worth noting that *The Link* has a total of five global reviews.  *See* Grossman Decl. Ex. C.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

239555273
202830-10079

8

DEFENDANT'S MOTION TO DISMISS

Plaintiff has clearly failed to allege access via widespread dissemination. [3]

***Plaintiff Fails To Plaubily Allege Access Via Chain of Events***: Plaintiff also asserts that he gave a copy of *The Link* to unspecified Paramount "staff" when he worked on a production of *Cirque Du Soleil: Worlds Away 3D* ("Worlds Away") in 2011.  Compl. ¶7.  Paramount was not involved in the production of Worlds Away – as the Blu-Ray cover that Plaintiff cites indicates, that film was "a Cirque du Soleil Production."  *Id*.[4]  But even accepting Plaintiff's allegations as true for purposes of this motion to dismiss, at most Plaintiff has alleged "'bare corporate receipt' of [his] work by an individual who shares a common employer with the alleged copier," which does not suffice to establish access.  *Loomis*, 836 F.3d at 995; *see also, e.g., Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp.2d 1043, 1056 (C.D. Cal. 2010) (collecting cases).

Rather, to establish access via chain of events, "a plaintiff must show that he submitted his work to an intermediary who is in a position to transmit the plaintiff's work to the creators of the infringing work."  *Bernal*, 788 F. Supp.2d at 1056 .  "The intermediary can be a person who (1) has supervisory responsibility for the allegedly infringing project, (2) contributed ideas and materials to it, or (3) worked in the same unit as the creators.  At a minimum, however, the dealings between the plaintiff and the intermediary and between the intermediary and the alleged copier must involve some overlap in subject matter to permit an inference of access."  *Id.*

For example, in *Loomis,* the plaintiff alleged that the defendants accessed his song based on allegations that a former member of plaintiff's band collaborated on a

---

[3] Plaintiff suggests that *Gray v. Perry*, No. 2:15-cv-05642-CAS (JCx), 2018 U.S. Dist. LEXIS 138263 (C.D. Cal. Aug. 13, 2018) somehow invalidates the above precedents.  Compl. ¶ 21.  It does not.  In *Gray*, the court merely held that a triable issue on access existed where plaintiff's song had "achieved critical success, including a Grammy nomination," and had been viewed "**millions of times** on YouTube and Myspace."  *Id.* at *12 (emphasis added).  It did not remotely suggest that a work's mere availability on the Internet is sufficient to plead access.

[4] Paramount subsequently acquired distribution rights in Worlds Away from Cirque du Soleil Burlesco, LLC, well after Plaintiff allegedly worked on the production.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

239555273
202830-10079

9

DEFENDANT'S MOTION TO DISMISS

film with the defendants. 836 F.3d at 997. The packaging from the film showed that the former band member received songwriting credits on two tracks, and defendants were listed as co-producers of the movie. *Id.* However, the Ninth Circuit found plaintiff's theory "deficient" because there was "no evidence detailing the responsibilities of [defendants or the former band member] with respect to the film, let alone evidence that demonstrated that they actually worked together... Nothing in the record shows the requisite nexus between [the former band member] and [defendants] except for [plaintiff]'s own speculation." *Id.* Accordingly, the Ninth Circuit held that plaintiff failed to establish defendant's access to his work.

Here, Plaintiff has not alleged the identity of **any** of the purported Paramount staff to whom he gave a copy of *The Link.* Further, Plaintiff has not alleged that any of the people he supposedly gave his book to had any connection to the creation of *Infinite.* Plaintiff's allegations are based on speculation and conjecture, and are legally insufficient to plead access. *See Washington v. ViacomCBS, Inc.*, No. CV 20-435 CBM (PJWx), 2021 U.S. Dist. LEXIS 104820, at *5 (C.D. Cal. May 21, 2021) (allegation that plaintiff submitted her work to producers allegedly employed by CBS failed to present a plausible theory that CBS accessed her work); *Griffin*, 2018 U.S. Dist. LEXIS 226086, *14 (granting dismissal where alleged chain of events was "too speculative and support nothing more than a bare possibility of access."); *Panton v. Strong*, 2018 WL 5099666, at *3 (C.D. Cal. Mar. 14, 2018) (granting dismissal where speculative allegations failed to plead an adequate nexus between the alleged intermediary and the creation of defendant's work).

As a matter of law, Plaintiff has failed to demonstrate a plausible theory of access, and his claim must be dismissed.

**B.    The Works Are Not Substantially Similar.**

**1.    To State a Claim, Plaintiff Must Demonstrate "Substantial Similarity" Between the Works' Protected Elements.**

Even where (unlike here) the plaintiff shows the defendant **actually copied**

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

239555273
202830-10079

10

DEFENDANT'S MOTION TO DISMISS

his work, the plaintiff must demonstrate that the copying in question is **<u>unlawful</u>** because the defendant copies "enough of the plaintiff's [protected] **<u>expression</u>** of those ideas or concepts to render the two works **'<u>substantially similar</u>'**" in their "**<u>protected elements</u>**." *Rentmeester*, 883 F.3d at 1117 (emphasis added).

On a motion to dismiss, courts apply the "extrinsic test" to determine if substantial similarity exists. *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994). The extrinsic test evaluates the "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters and sequence of events." *Funky Films v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1077 (9th Cir. 2006). In applying the extrinsic test, the "court compares, not the basic plot ideas for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters." *Id*.

"General plot ideas are not protected by copyright law," and cannot give rise to an infringement claim. *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985). Similarly, "*[s]cenes-à-faire*, or situations and incidents that flow necessarily or naturally from a basic plot premise, cannot sustain a finding of infringement;" nor can "[f]amiliar stock scenes and themes that are staples of literature …." *Cavalier v. Random House, Inc.*, 297 F.3d 815, 823 (9th Cir. 2002). Thus, as the Ninth Circuit has emphasized, the Court "must take care to inquire only whether the **<u>protectable elements, standing alone</u>**, are substantially similar" and thus must "filter out and disregard the non-protectable elements" – including shared ideas, concepts, and *scenes-à-faire* – when considering substantial similarity. *Cavalier*, 297 F.3d at 822) (emphasis in original); *see also, e.g., Rentmeester*, 883 F.3d at 1118.

## 2. The Court Can Compare the Works and Determine Lack of Substantial Similarity on a Motion to Dismiss.

"[T]he Ninth Circuit has [long] noted that…'when a copyrighted work and the alleged infringement are both before the court, capable of examination and comparison, non-infringement can be determined on a motion to dismiss.'" *Zella v.*

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

239555273
202830-10079

11

DEFENDANT'S MOTION TO DISMISS

*E.W. Scripps Co.*, 529 F. Supp.2d 1124, 1130 (C.D. Cal. 2007); *see Rentmeester*, 883 F.3d at 1123 (affirming dismissal where "[n]othing disclosed during discovery could alter the fact that the allegedly infringing works are as a matter of law not substantially similar . . . ").  Indeed, as the Ninth Circuit observed in *Masterson v. Walt Disney Co.*, 821 F. App'x 779 (9th Cir. 2020), in just the past decade the Ninth Circuit has "repeatedly" affirmed dismissals of copyright infringement cases involving literary works in memorandum dispositions where a review of the works revealed no substantial similarity as a matter of law. *Id.* at 780 & n.1 (collecting cases, and affirming dismissal of infringement claim); *see also Carlini v. Paramount Pictures Corp.*, No. 21-55213, 2022 U.S. App. LEXIS 5480, *3-6 (9th Cir. Mar. 2, 2022) (affirming dismissal of infringement case based on comparison of works); *Whitehead*, 2022 U.S. Dist. LEXIS 215901, *26 (same).  In conducting this review, "the works themselves supersede and control [any] contrary descriptions of them … contained in the pleadings." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010); *see also Silas v. HBO, Inc.*, 201 F. Supp.3d 1158, 1173 (C.D. Cal. 2016) (allegations that "misrepresent[] the works" are "insufficient to state a claim for infringement").

### 3.    The Protectable Elements of the Works Are Not Similar.

*Plot and Sequence of Events:*  As explained above, concepts and general plot ideas are not protectable and, therefore must be "filtered" out from the Court's analysis of whether two works are substantially similar.  Here, as a threshold matter, the concept of a story about characters who reincarnate over the course of thousands of years and remember their past lives is not protectable.[5]  *See, e.g., Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 625 (9th Cir. 2010) (no similarity between identically-titled works that "share the historically unfounded premise of an American war veteran going to Japan to help the Imperial Army by training it in the

_____

[5] Plaintiff concedes that this concept has been included in hundreds of works. Compl. ¶¶117-120.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

239555273
202830-10079

12

DEFENDANT'S MOTION TO DISMISS

methods of modern Western warfare for its fight against a samurai uprising"); *Funky Films,* 462 F.3d at 1077-78 (no similarity between two works based on death of family patriarch who leaves two sons to run family funeral home, both of which involve return of one son to hometown to help in the business, another son changing his religion to aid in the business, and competitor bidding on the business); *Berkic,* 761 F.2d at 1293 (no similarity between two works about exposing criminal organization that murders healthy people and sells the organs for transplants).[6]

Similarly, any ideas that naturally flow from the concept of reincarnation – such as characters being drawn together in multiple lives, grappling with the moral consequences of reincarnation, or being able to draw on the accumulated knowledge of their past lives – constitute *scènes-à-faire* and are not protectable. For example, in *Fillmore v. Blumhouse Prods., LLC*, No. 2:16-cv-04348-AB-SS, 2017 U.S. Dist. LEXIS 211021 (C.D. Cal. July 7, 2017), the court examined two works involving a "Lazarus" character and the concept of scientific reanimation. The court held that shared concepts of death and reanimation "can be said to 'necessarily flow' from the term 'Lazarus' and the connotations that accompany it…[and] are not a basis for establishing extrinsic similarity." *Id.* at *23-24. So, too, here, the elements which necessarily flow from the concept of reincarnation are not protectable.

Accordingly, it is well-settled that even where two works "share the same basic plot premise" – which is not the case here – that does not support an infringement claim where (as here) "a closer inspection reveals that they tell very different stories." *Benay*, 607 F.3d at 625. Here, shorn of the unprotectible idea of

---

[6] Nor will courts find substantial similarity where similarities are based in religious themes or stories that are in the public domain. *See Christenson v. FLTI*, No. 6:13-cv-00254-AA, 2013 U.S. Dist. LEXIS 154029, at *21 (D. Or. Oct. 23, 2013) ("As part of the public domain, the Nativity story and/or the characters therein are also unprotectible."); *see also Gable v. NBC*, 727 F. Supp.2d 815, 838 (C.D. Cal. 2010) ("At an abstract level, both [works] involve the central themes of karma and redemption. The ideas of righting past wrongs and good things happening to good people are general storylines that have been around for thousands of years. These ideas, standing alone, are not protectable.").

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

239555273
202830-10079                    13                    DEFENDANT'S MOTION TO DISMISS

a good vs. evil reincarnation story and *scènes à faire* flowing therefrom, the plots of *Infinite* and *The Link* are entirely dissimilar.  *Infinite* is about Evan McCauley, a man mistakenly diagnosed with schizophrenia, who is captured by police and rescued by a woman who reveals that she is part of a secret society of people who remembers their past lives.  Evan discovers that, rather than being schizophrenic, he is actually one of approximately 500 Infinites, who are split into warring factions of Believers and Nihilists.  The plot centers on a device created by the Nihilist's leader, Bathurst, called the Egg, which was created to destroy all life on Earth and stop the cycle of reincarnation.  With the aid of other Believers, Evan remembers where he hid the Egg in a past life, and is able to regain his ability to manipulate energy; he uses this power to stop Bathurst from detonating the Egg, and to trap Bathurst's soul in a computer chip so that he cannot reincarnate.  The film ends with Evan, reincarnated this time as a boy in Indonesia, easily regaining his past life memories.

By contrast, the protagonist of *The Link*, Sydney Tobias, is a famed astrologer and novelist.  *The Link* features religious references, imagery and Biblical characters and (unlike *Infinite*) includes extended flashbacks to Sydney's past lives in different eras.  Sydney's first life took place during the birth of Christ, and the novel also covers Sydney's prior lives and encounters involving the library of Alexandria, Nostradamus in France in the 1500s, and in post-WWII adventures in Germany and South America.   Sydney's goal throughout all of these eras is to find the reincarnation of Jesus Christ through the use of astrological predictions.  The novel culminates in Sydney finally locating Jesus's reincarnation as an 11-year old boy from Alabama.  Sydney and Jesus attend a spiritual ceremony where Jesus frees the souls of dead soldiers.  The antagonist of the novel is Judas, who has spent the last two millenia attempting to eradicate the Jewish people.  Judas believed he was following the teachings of Jesus by trying to exterminate the Jewish people, but after meeting Jesus (in the form of 11-year old Charlie), Judas learns that he was wrong.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

239555273
202830-10079

14

DEFENDANT'S MOTION TO DISMISS

Despite the vast differences between the works, Plaintiff, as copyright claimants often do, proffers a list of purported "similarities" as Exhibit 11 to the Complaint.  Courts frequently disregard such lists of cherry-picked lists of "random similarities scattered throughout the works" that fail to comprehensively analyze the protected elements of the plot and sequence of events.  *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984) ("such lists of similarities…are inherently subjective and unreliable."); *see also, e.g., Kouf*, 16 F.3d at 1045-46 (same); *Gable*, 727 F. Supp. 2d at 841 (plaintiff's list, "made up of random similarities that have no qualitative significance to the works," was not "probative of similarity.").

Further, the Court's review of the works will reveal that Plaintiff's alleged "similarities" either consist of unprotectible stock elements and *scènes à faire* that flow naturally from the works unprotectible concept, and/or blatantly mischaracterize the works.  For example, Plaintiff claims as a similarity that both protagonists "had two different professions," Compl. Ex. 11 at 5, no. 11, but Evan has **no** job in *Infinite* – he is unable to obtain gainful employment due to his perceived schizophrenia and is reduced to creating weapons for a drug dealer (using his ancient knowledge) in exchange for medication.  This does not remotely resemble Sydney's professions, in *The Link*, as a renowned astrologer and author.  Further, Plaintiff's own list shows that, in each work, the purported similarities are expressed differently: for example, Plaintiff compares an "interrogation" scene in *The Link* where the protagonist is being tortured in a Vatican prison in 1093, to an "interrogation" scene in *Infinite* where Bathurst meets Evan in a police interrogation room in present-day New York.  *See id.* at 7, no. 16.  Plaintiff's list of purported similarities does not support a finding of any similarity of expression.

Courts in this Circuit have *repeatedly* rejected infringement claims based on far greater similarities in ideas and *scènes à faire* then those at issue here.  For example, in *Benay*, the Ninth Circuit found no protectible similarity between the film The *Last Samurai* and plaintiff's work of the *exact same title*, even though:

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

239555273
202830-10079

15

DEFENDANT'S MOTION TO DISMISS

[B]oth [works] share the historically unfounded premise of an American war veteran going to Japan to help the Imperial Army by training it in the methods of modern Western warfare for its fight against a samurai uprising; both have protagonists who are authors of non-fiction studies on war and who have flashbacks to battles in America; both include meetings with the Emperor and numerous battle scenes; both are reverential toward Japanese culture; … both feature the leader of the samurai rebellion as an important foil to the protagonist[; and] in both works the American protagonist is spiritually transformed by his experience in Japan.

607 F.3d at 625. The Ninth Circuit recognized that any similarities "flow[ed] naturally from the works' shared basic [and unprotectible] plot premise," and concluded that, "[s]tripped of these unprotectible elements, the works are not sufficiently similar to satisfy the extrinsic test." *Id.* As in this (and many other) cases, the works at issue here tell "fundamentally different stories," even if they "share [a somewhat similar] premise and … elements that flow naturally from that premise." *Id*. at 626; *see also Shame on You Prods. v. Banks*, 120 F. Supp. 3d 1123, 1151-53 (C.D. Cal. 2015), *aff'd* 690 F. App'x 519 (2017) (dismissing case where "many of the purported similarities … flow directly from the basic premise of a walk of shame," but the "narratives [of the works were] strikingly different.").

*Characters*: To be deemed protectible, characters must be "especially distinctive" and "contain some unique elements of expression." *DC Comics v. Towle* , 802 F.3d 1012, 1021 (9th Cir. 2015). A "stock character or basic character type … is not entitled to copyright protection." *Shame on You Prods.*, 120 F. Supp.3d at 1164. Nor are "traits that flow naturally from the works' shared premises." *Benay*, 607 F.3d at 626. "When analyzing whether two protectible characters are substantially similar, courts require a very high degree of similarity between characters." *Silas*, 201 F. Supp.3d at 1177.

Contrary to Plaintiff's allegations, there is no similarity between the works' main characters, *The Link*'s Sydney (a famous astrologer and author, who is featured on national talk shows, has billionaire clients, and for whom astrology plays a central role in both his efforts to track down Jesus Christ, and in his life philosophy)

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

239555273
202830-10079

16

DEFENDANT'S MOTION TO DISMISS

and *Infinite*'s Evan (a man diagnosed with schizophrenia who cannot hold down a job, with no connection to astrology, and who eventually regains his past-life skills as a talented warrior, with the power to manipulate matter). The only conceivable "similarity" is that they both discover the ability to recall their past lives; as explained above, this unprotectible premise cannot support an infringement claim.

Plaintiff nevertheless alleges that the protagonist in each work is "male," "unmarried," "childless," "adopted," "having two professions," and are "heroes lacking reincarnation recall." Compl. ¶126. The fact that both protagonists are "male," "unmarried," "childless" and "adopted" are clearly not "especially distinctive" (and thus not protectable) character traits. Moreover, while both protagonists may be "unmarried," in *The Link* Sydney has a romantic relationship with Lilith/Lucia; but Evan does not have any romantic relationship. And, as explained above, Evan does not have "two professions" – rather, because of his past, Evan is unable to hold down a job.

While it is true that neither Evan nor Sydney start their story with the ability to recall their past lives, each character's path to recall is entirely different. Sydney recalls his past lives immediately upon the first incantation recited by Horace. On the other hand, Evan spends much of the film attempting to recall his past lives, but Evan must actually die and come back in order to achieve recall. Furthermore, once he is able to remember, he gains supernatural abilities not present in *The Link*.

Plaintiff also alleges that *Infinite*'s Nora is substantially similar to both Sydney and Lilith in *The Link*. Setting aside that attempting to establish a similarity through an amalgamation of characters is impermissible, *see Rose v. Connelly*, 38 F. Supp. 54, 56 (S.D.N.Y. 1941) (rejecting plaintiff's attempt to compare character to "more than one of defendants'" characters), Nora does not remotely resemble *either* Sydney or Lilith. Nora, the first Infinite that Evan meets, is young, blonde, attractive, and a gifted fighter, displaying extreme physical abilities in many of the film's action sequences. Her role in *Infinite* is mainly to teach both Evan and the

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

239555273
202830-10079

17

DEFENDANT'S MOTION TO DISMISS

viewer about reincarnation and the conflict between the Nihilists and the Believers. She is not an astrologer or a novelist, or particularly interested in religion or spirituality, and does not remotely resemble Sydney, the protagonist of *The Link*. Nor does she resemble the character of Lilith, who appears in multiple guises in *The Link*, first as a Greek oracle named "Mother Gaea." Lilith is never depicted as a fighter; further, unlike Nora, Lilith does not (and does not want to) recall her past lives. Instead, her defining characteristic in each life is her power of prescience (which Nora does not have). Again, any "similarity" stems from the unprotectible premise of characters who can remember their past lives.

Nevertheless, Plaintiff alleges that Nora's "romance across reincarnations" is similar to that between Sydney and Lilith. Compl. at ¶96. But while the concept of characters whose relationship spans lifetimes flows naturally from the works' shared reincarnation premise, there is no similarity in the works' respective *expression* of this unprotectible concept. In *Infinite*, Nora's lover, Abel, appears only in the film's opening scene; when Nora discusses him later, it is revealed that because Abel was "Dethroned" (*i.e.*, prevented from reincarnating) she could not reunite with him in this lifetime. By contrast, in *The Link* Sydney and Lilith face no such obstacle.

Plaintiff also makes much of the fact that both Lilith and Sydney and Nora and Abel die "trapped together," in a "bonfire" caused by the villain. Compl. ¶96. But this is a plot event, not a character similarity, and, in fact, these scenes have little in common. In *Infinite's* first scenes, Nora and Abel's car is struck by a semi-trailer truck. The car explodes and Nora dies; it is later revealed that Bathurst captured Abel's soul, keeping Abel and Nora from being reunited in the next life. Grossman Decl. Ex. A at 6:30-7:43. By contrast, in *The Link*, Sydney has been tortured in a Vatican prison in 1093, and is set to be burnt at the stake. Lucia visits him there and gives him a medicine; the Vatican soldiers find Lucia, however, and burn her at the stake alongside Sydney. *See* Compl. Ex. 10 at 114-117. These scenes involve different characters, engaging in different actions, and being killed a

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

239555273
202830-10079

18

DEFENDANT'S MOTION TO DISMISS

1  thousand years apart in very different manners.

2        Finally, Plaintiff also attempts to find similarities between the antagonists in

3  each work, Bathurst in *Infinite* and Nicholas/Judas in *The Link*.  Specifically,

4  Plaintiff alleges that both villains speak Latin and are "bent on worldly genocide."

5  But the fact that two characters speak the world's most famous classical language

6  flows naturally from the unprotectible premise of characters who have reincarnated

7  since ancient times.  And while the two characters are both villains, they are distinct

8  in all measures of protectable expression.  In *Infinite,* Bathurst is bent on destroying

9  all life in the universe because he experiences reincarnation as a never-ending

10  torture.  In *The Link*, the villain is the reincarnation of the biblical figure of Judas,

11  who seeks the eradication of the Jewish people (believing that this is what Jesus

12  would have wanted).  In furtherance of this goal he, *inter alia*, incites the Holocaust.

13  The fact that both villains engage in acts of violence – for completely different

14  reasons – does not support a finding of similarity of protected expression.  *Fillmore,*

15  No. 2017 U.S. Dist. LEXIS 211021, at *26 (fact that both villains "(1) engage in an

16  indiscriminate killing spree and (2) are . . . adversely affected by reanimation" was

17  "not distinctive enough to be properly considered protectable expression.").

18        **Setting:**  *The Link* takes place over millennia.  The novel takes place in biblical

19  times, in Ancient Greece and Egypt, in the Vatican in 1093, in 1500s France, and then

20  in Florida, San Diego, Mississippi, Alabama and finally New York on 9/11.  By

21  contrast, *Infinite* begins with one flashback in 1980s Mexico City, and then proceeds

22  chronologically in the present day.  Evan's story begins in New York City, but then

23  largely takes place at "The Hub," the Believers' headquarters, before moving to

24  London.  Though both works include some scenes set in New York City, *Infinite*

25  begins in 2020s New York and *The Link* ends in New York on 9/11.  *See DuMond v.*

26  *Reilly*, No. CV 19-8922-GW-AGRx, 2021 U.S. Dist. LEXIS 37241, *55-56 (C.D.

27  Cal. Jan. 14, 2021) (fact that both works were set in large American cities did not

28  weigh in favor of finding substantial similarity, as "comparisons between settings

239555273
202830-10079

DEFENDANT'S MOTION TO DISMISS

should be undertaken at a much-more-granular level."). Accordingly, the settings of the works are not similar.[7]

   *Dialogue:*  There is no "extended similarity in dialogue" in the two works, as is required to establish substantial similarity. *Shame on You Prods.*, 120 F. Supp. 3d at 1156; *see also Olson v. NBC*, 855 F.2d 1446, 1450 (9th Cir. 1988). Plaintiff's attempt to cherry-pick isolated words or phrases fails to establish the requisite similarity. For example, Plaintiff claims that the works are similar because, in each, the antagonist refers to the protagonist as "old friend." Use of this term to describe a person with whom one is reunited is obvious. *See Shame on You Prods*, 120 F. Supp. 3d at 1156 ("[P]hrases or expressions conveying an idea typically expressed in a limited number of stereotyped fashions" are not protectable). Similarities in "short excerpts of dialogue… do not rise to the level of substantial similarity." *Cline v. Reetz-Laiolo*, 329 F. Supp. 3d 1000, 1040 (N.D. Cal. 2018).[8]

## IV.   CONCLUSION

   Defendant requests that Plaintiff's Complaint be dismissed.

Dated:  October 15, 2024                 LOEB & LOEB LLP


                                          By:    */s/ David Grossman*
                                                 David Grossman
                                                 Attorneys for Defendant

---

[7] Plaintiff argues that similarities between the cover art for the *The Link* and *Infinite* should be taken as proof of substantial similarity. Compl. ¶¶47-59. The cover of *The Link* shows the author standing between an Egyptian pyramid and the Twin Towers. *Id.* ¶55. *Infinite's* cover art depicts the character of Evan between a mountain peak (the location of the Hub) and an entirely different New York cityscape (where Evan lives). Even if the cover art of both works was relevant to a substantial similarity analysis – it is not – *Infinite's* cover art is not "substantially similar" to *The Link*, as it does not depict a pyramid or the Twin Towers.

[8] The works' themes, mood and pace are also markedly dissimilar. *The Link* contains themes that are religious in nature, addressing and depicting forgiveness and revelation, whereas *Infinite* is a straightforward action film involving a hero attempting to save the world from destruction. Further, *The Link* progresses slowly, touching on Sydney's exploits (and those of Judas) over the course of thousands of years in different situations and on different continents. On the other hand, *Infinite* is a two-hour film, and its pace moves very quickly, spanning days, not centuries.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

239555273
202830-10079

20

DEFENDANT'S MOTION TO DISMISS